IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 1, 2019

**IN RE  JAYDA H.**

**Appeal from the Juvenile Court for Hamblen County**
**No. J150132          Janice Hope Snider, Judge**

_____

**No. E2019-00855-COA-R3-PT**

_____

This is an appeal from a termination of parental rights proceeding.  The trial court found that three grounds for termination had been established against the child's father: substantial noncompliance with the requirements of the permanency plan, persistent conditions, and failure to manifest an ability to parent.  The trial court also determined that it was in the child's best interests to terminate the father's parental rights.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Ryan T. Logue, Newport, Tennessee, for the appellant, Jerry H.

Herbert H. Slattery, III, Attorney General and Reporter; Jeffrey D. Ridner, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

Jerry H. ("Father") is the father of the child who is the subject of this appeal, Jayda H.[1]  The Department of Children's Services ("the Department") initially became involved in this matter following a referral in December 2015.  According to the Department's "Petition to Transfer Temporary Legal Custody and for Ex Parte Order," the allegations of which were ultimately stipulated to by Father, the Department's initial involvement

_____
[1] This Court has a policy of protecting children's identities in parental termination cases, and therefore, certain names appearing herein are presented by their initials.

was connected to drug use by Father and the child's mother.[2]  In relevant part, the Department's December 2015 petition outlined the following:

1. DCS received a referral at approximately 9:30 PM on December 16, 2015 indicating that on December 16, 2015 the mother's fiancé, [Father], was high and huffing paint while the herein child was in his care.  The referral further alleged that law enforcement observed a gold paint can and bag of silver and gold paint in the home and noted that [Father] was high.  The referral also reported that the Mother . . . was not at the home at the time of this incident but that she returned later and appeared to be protective of the child.  The referral stated that law enforcement presence was required at the home following the week prior to December 16, 2015 visit because [Father] overdosed on Klonopin.

2. On December 18, 2015, Case Manager Erica Powell . . . went to the family home.  At the time of arrival, the child was in the home with the Mother, [Father], [T.P.], and [E.W.].  The adults indicated that another individual, [K.J.L.], also resides in the home but was not present at the time of the interview because he was arrested a few days prior and remained incarcerated.  Upon information and belief, [E.W.] does not have custody of her own children and is restricted to supervised contact with them due to her own drug use and lack of stable home.

3. The Mother reported that she is prescribed Suboxone, Klonopin, Seroquel, and Neurotin.  She was able to provide proof of her prescriptions for Klonopin and Suboxone, but was unable to provide a pill bottle for her Klonopin prescription.  A count was performed on the Mother's Suboxone, which showed that she had more than the expected amount remaining.  The Mother provided a sample for a urine drug screen and tested positive for Suboxone, Amphetamines, Methamphetamine, and Benzodiazepine.  The Mother admitted to taking Methamphetamine.

4. [Father] reported that he has a prescription for Suboxone, Klonopin, and Gabapentin.  He provided a sample for a urine drug screen and tested positive for Amphetamines, Methamphetamines, and Benzodiazepine.  [Father] could not provide proof of his Klonopin prescription nor could he provide a pill bottle for a pill count.  [Father] had more Suboxone

---

[2] The parental rights of the child's mother are not at issue in this appeal.  The record reflects that the mother of the child previously surrendered her parental rights.

- 2 -

strips than he should have based on the dates and directions on his pill bottle. He admitted to huffing paint a week prior.

On December 21, 2015, the Hamblen County Juvenile Court ("the Juvenile Court") entered a protective custody order, pursuant to which temporary legal custody was awarded to the child's paternal grandmother. At the time of removal from her parents, the child was slightly over six months old. The following spring, in March 2016, the Juvenile Court entered an "Adjudicatory Order," wherein it was held that the child was dependent and neglected and that temporary custody should remain with the paternal grandmother. Although the order provided that Father could have supervised contact with the child, Father's visitation rights were later curtailed. In an order entered following a September 2016 hearing, the Juvenile Court held that "[Father] shall appear to the Court and avail himself of his rights if he desires further visitation with the child."

In addition to the changes regarding Father's visitation rights, the child's placement was also later altered. In September 2017, following allegations that the paternal grandmother had (a) violated a no contact order between Father and the child and (b) failed pill counts, the child was removed from the paternal grandmother's home.

Following the removal of the child from the paternal grandmother's home, on September 27, 2017,[3] a permanency plan was created. The permanency plan had a number of requirements for Father in an attempt to ensure that the child could someday reside in a safe and stable home. Among other things, Father was required to (1) show stable housing by providing monthly rent receipts and paid utilities receipts; (2) provide proof of reliable transportation such as a valid driver's license, car insurance, and vehicle registration; (3) complete an alcohol and drug assessment and follow all recommendations; (4) complete parenting classes and follow all recommendations; (5) complete a mental health assessment and follow all recommendations; (6) set up child support payments; (7) submit to random, observed drug screens within two hours of the time requested by the Department; (8) resolve all legal issues and refrain from incurring new charges; and (9) obtain employment and show stable income by providing the Department with monthly paycheck stubs or checks.

Although Father did address some of these requirements, others were outstanding and uncompleted at the time of trial. For instance, Father did not complete all recommendations from his alcohol and drug assessment. As the proof at the trial showed, drugs remained a significant issue for Father even after a petition to terminate his parental rights was filed. Indeed, although Father had regained visitation rights with the child by the summer of 2018, these rights were removed once again in January 2019 following a failed drug test.

---

[3] The permanency plan was ratified on April 30, 2018.

The termination petition in this matter, which was filed by the Department on December 17, 2018, alleged three grounds for termination of Father's parental rights: substantial noncompliance with permanency plan, persistent conditions, and failure to manifest an ability to parent. The petition further averred that the termination of Father's parental rights would be in the child's best interest. A hearing on the termination petition was later held by the Juvenile Court on April 24, 2019.

The proof at trial covered several areas, including Father's plagued history with drugs and his financial status. The evidence reflected that Father had been using drugs since he was 13 years old, and as noted earlier, it was his drug usage that initially precipitated the child's removal from his care. Although Father claimed that the child had changed his life and that he had "been by the law" since the child was born, this was clearly belied by the proof presented. After all, Father had failed a drug screen incident to the child's removal. When pressed on this issue and how his testimony about following the law squared with his use of illegal drugs after the child's birth, Father responded, "Well, I mean, I just started it." Father ultimately admitted he had made mistakes and testified that he was not going to say that he did not "slip off the wagon," but he also did not admit to every failure set forth by the Department. When asked about a recent failed drug screen for methamphetamines, for instance, Father stated as follows: "[The Department] said I failed one but I don't believe it."

Father's testimony acknowledged that he had continued to use drugs following the child's removal from his care. He further admitted that, following a stint where he had been in jail, he "got back with the same people and . . . ended up starting to do the same things." According to the testimony of April Turner, a case manager with the Department, Father tested positive for methamphetamine in October 2018 and tested positive for amphetamines, buprenorphine, methamphetamine, opiates, and THC in December 2018. Father also failed a drug screen in March 2019.

Father's drug struggles clearly persisted after the filing of the termination petition.[4] Ms. Turner testified that Father had even missed certain drug screens, including one the Monday prior to trial. When Ms. Turner met with Father in March 2018 during a period when he was in jail, she offered to arrange for services, including his required alcohol and drug assessment. Father, however, indicated that he wanted to wait until he was released. Ms. Turner provided her contact information and asked Father to contact her within 72 hours of his release, but, as it turned out, Ms. Turner did not speak with Father until approximately two months after his release. This occurred, she testified, notwithstanding her own efforts to try to contact Father.

---

[4] The evidence at trial revealed that Father tested positive for drugs twice after the filing of the petition to terminate his parental rights.

- 4 -

Contact ultimately resumed between Father and the Department, and the proof showed that Father finally completed an alcohol and drug assessment in October 2018. The assessment revealed that Father had "a high probability of having a substance use disorder." Although Father was supposed to thereafter attend NA and AA meetings, as well as an outpatient processing group, these recommendations had be to revisited upon Father's failure of yet another drug test. Father was then required to attend intensive outpatient therapy, something he started the month prior to trial but which remained uncompleted. According to a progress report submitted into evidence, Father tested positive for methamphetamine and amphetamines at his first session.

Father's continued drug problem affected his ability to visit with the child, as the removal of his visitation in January 2019 was a direct result of his having failed drug screens. Regarding a scheduled visit with the child in December 2018, Ms. Turner recalled that Father had shown up "visibly impaired" and had failed his drug screen. When specifically relating what had occurred, Ms. Turner testified as follows:

> He had a visit that day scheduled with [the child]. When he arrived for the visit, I was told from the other employees to go out and check and see what he was doing.
>
> When I approached around the corner, he was kind of falling asleep in his chair. He kept dropping his cups and his drinks and all of his stuff. It appeared as if he was about to fall out of the chair a couple of times. And when he did stand up, he stumbled and slurred his speech.

According to Ms. Turner, after the results of the drug screen were discussed with Father, Father said that the Department was holding things against him and screamed "loud enough for other employees on the other side of the wall to hear." Ms. Turner asked Father to leave because the child was close by, and Ms. Turner believed that Father was being so loud that the child could hear him.

Father's trial testimony placed blame at the child's mother for certain of his initial failures to take steps to regain custody of the child. In relevant part, he stated as follows:

> I was taking her to her classes and stuff and everything and she was like, "Well, I'll take and I'll do the classes and stuff and everything and when I get her back in my life, then you'll be able to see her."
>
> And like an idiot, I fell for that. So I was taking and listening to her. But then I thought, well, after a while, I started thinking when I got the classes mentioned to me down there -- the certificates -- my counselor down there said, "You know what. You don't need to depend on nobody but yourself."

He reiterated this sentiment later in his testimony, stating as follows:

> [A]t first, it was put into my head that I was believing everything that I was told. That . . . the child's mother, was going to take care of all of this and everything.
>
> And I finally realized that there wasn't nobody going to be able to do nothing but me.

During the pendency of proceedings concerning the child, Father often did not show up in court. According to his testimony, this was due to his fear that he would get "picked up" on account of certain probation violations. Although Father testified at trial that he was working as a handyman for an individual's rental properties and claimed to make $10 an hour, he admitted that he never provided Ms. Turner with any proof of income. Father testified that he rented a two-bedroom home with water and electricity and paid $200 a month in rent and $150-180 a month for his electric bill. He further testified that his prescriptions cost him around $63 and that his doctor's visits, every two weeks, cost $100. He asserted, however, to make about only $300 to $400 a month as a handyman. Ms. Turner testified that Father had not provided any proof of his housing until a few weeks prior to trial, and she stated that Father had never told her what his monthly income or work schedule was. Her testimony indicated that Father could have established his proof of income by a mere letter from his claimed employer:

> We reviewed multiple times that if he's working under the table, that's fine. I understand that. That happens often, and I just asked that he brought a letter in from his employer, signed, just saying that he worked there, and how long he had worked, and how much he makes.

Whereas the permanency plan required Father to provide proof of reliable transportation, Father did not do so. Father did not have a driver's license, and although Father testified that his mother could drive him and the child, it was clear that his mother's contact with the child was limited to therapeutic visitation.

In light of Father's long history of drug use, something that continued even after the filing of the termination petition, Ms. Turner opined that it would not be in the child's best interest to return to Father's custody. According to Ms. Turner, Father's problem with drugs, as well as his lack of stable employment, evidenced an absence of change on Father's part:

> He's still using drugs. He's still failing for methamphetamine, as most recently as March. He still doesn't have solid employment. I know that that's, you know, he's working under the table, but he doesn't have stable employment.

Honestly, just -- I feel like -- I'm going to kind of -- okay -- so I feel the drug use is a big thing. I feel that for [Father], he has had a lifetime of drug use. And like he said before, I feel that that would be his big test to overcome.

At the time of trial, the child had been in a foster family for 19 months. The proof showed that the foster family was a pre-adoptive home, and the foster mother testified that the child does well in her home, has her own room, and likes the family dogs. Although the foster mother testified that she had given Father her phone number and informed him that he was welcome to text anytime and ask about the child, she claimed Father had only initiated contact "maybe two or three times." According to the foster mother, the child's attachment to the foster family had increased, and when asked by Father's counsel if the child talked about his client, the foster mother replied, "No."

Following the conclusion of the termination hearing, the Juvenile Court entered an order terminating Father's parental rights. The court found that Father had failed to substantially comply with the requirements of the permanency plan, that persistent conditions existed, and that Father had failed to manifest an ability to parent. Regarding the last of these established grounds for termination, the Juvenile Court found that returning the child to Father's custody would pose a risk of substantial harm. The Juvenile Court further concluded that terminating Father's parental rights would be in the child's best interests. This appeal followed.

## STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App. 2007). "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). In this State, "[w]ell-defined circumstances exist under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015). Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental rights must prove two things. They must first prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Then, they must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate a parent's parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination

cases. *In re M.L.P.*, 228 S.W.3d at 143. "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d at 143.

Due to the heightened burden of proof required under the statute, we must adapt our customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.*

## DISCUSSION

Although Father's brief only raises a single issue for our consideration—whether it is in the child's best interests to terminate his parental rights—our appellate review cannot be so restricted. In order to help "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures," we are required to review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

*Substantial Noncompliance with the Permanency Plan Requirements*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), a court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). In conjunction with terminating a parent's parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014)). "The trial court must then find that the noncompliance is substantial." *Id.* Although the termination statute does not define what conduct constitutes substantial noncompliance, terminating parental rights under this ground "requires more proof than that a parent has not complied

with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d at 656. The significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* at 548-49. Because determining whether substantial noncompliance exists is a question of law, we review the issue de novo with no presumption of correctness. *Id.* at 548.

Here, the Juvenile Court determined that the permanency plan created in this case was "reasonable and related to remedying the conditions which necessitated [the child's] original removal from her parents and subsequent foster care placement." It further determined that Father had failed to substantially comply with the requirements of the permanency plan. The Juvenile Court commented that Father failed to make meaningful efforts to complete the most important steps of the permanency plan before the termination petition was filed and regarded his efforts as "too little, too late." Among other things, the Juvenile Court observed that Father had only finally enrolled in intensive outpatient treatment the month before trial, that Father had acquired stable housing within the past few months, and that his employment stability was still uncertain.

We discern no error in the Juvenile Court's determination of substantial noncompliance. There is no question that Father fulfilled a number of the permanency plan requirements in this case, such as his completion of parenting classes. Nevertheless, it should be noted that "[d]etermining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537. As we have already noted, the significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned" to a particular requirement. *In re Valentine*, 79 S.W.3d at 548. Without a doubt, the permanency plan requirements relative to Father's drug usage loom large as significant obligations in this case. Regrettably, however, Father has failed to demonstrate diligent efforts to achieve sobriety, and he had not completed the recommendations of his alcohol and drug assessment by the time of trial. This is certainly troubling in light of the Juvenile Court's observation that Father has consistently been unable to remain free from drugs, and the proof showed that Father had missed certain drug screens, and failed others.

The permanency plan was created in September 2017, and testimony at trial indicated that Father had received a copy of the permanency plan by the end of the 2017 year.[5] Father's efforts in addressing his drug problems were less than punctual. Ms. Turner met with Father in March 2018 while he was incarcerated and offered assistance

---

[5] Ms. Turner testified that Father had been invited to participate in the development of the permanency plan but that he did not show up to the child and family team meeting.

regarding his required alcohol and drug assessment, but Father indicated he wanted to wait until he was released to address the issue. As already noted, although Ms. Turner testified that she gave her contact information to Father and requested that he contact her within 72 hours of his release, Ms. Turner did not speak with Father until approximately two months after he was released from jail, notwithstanding her own efforts at communication. For his part, Father would not complete his alcohol and drug assessment until October 2018, and that assessment generated several recommendations with which he needed to comply. The prescribed recommendations actually had to be changed when Father subsequently failed a drug test, and Father did not begin the required intensive outpatient therapy until the month before trial. His required therapy remained uncompleted, and he failed a drug test on his first session.

Other important requirements of the permanency plan remained unaddressed at the time of trial or were belatedly accomplished. For instance, Father reported to have recently acquired stable housing, but this was only reported to Ms. Turner weeks before trial. Moreover, although Father claimed to have certain income as a handyman, Ms. Turner testified that no proof of employment had ever been provided to her. Lastly, regarding Father's need to provide proof of reliable transportation, the Juvenile Court correctly noted that Father did not have a driver's license. Whereas he testified that he could rely on his mother, the proof demonstrated that this was problematic inasmuch as his mother's contact with the child was then restricted to therapeutic visitation.

As it is, Father's drug problems were not sufficiently addressed by the time of trial. Indeed, in part due to his own belated efforts, his required therapy had not been completed. In this vein, we agree with the Juvenile Court that the efforts he did take, alongside his belated reporting of housing, were "too little, too late." "[The] 'too little, too late' concept is often used to describe parents who, despite having an abundance of time and resources, wait until shortly before their termination hearing and then hurriedly try to comply with the obligations in their permanency plans." *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *10 (Tenn. Ct. App. Apr. 14, 2005). Because these belated efforts, compounded by other incomplete areas of the permanency plan (like the need for proof of stable income) establish substantial noncompliance on the part of Father, we affirm this ground for termination.

*Persistence of Conditions*

Tennessee Code Annotated section 36-1-113(g)(3) outlines the ground for termination commonly known as "persistence of conditions." When the termination petition was filed in this matter, the ground applied when:

> The child has been removed from the home or the physical or legal custody
> of a parent . . . for a period of six (6) months by a court order entered at any

stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3).[6]  The purpose behind this ground "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008).

The record clearly established this ground for termination.  At the time of trial, the child had been removed from Father's custody for more than six months.  Moreover, the record clearly and convincingly established that conditions preventing the child's return to Father remained, that there was little likelihood that these conditions would be remedied in the near future, and that the continuation of the parent and child relationship would greatly diminish the child's chances of early integration into a safe, stable, and permanent home.  As the Juvenile Court outlined:

[Father] has had ample opportunity to remedy the conditions leading to his child's removal from his custody in 2015 and the circumstances that excluded him as a placement resource when [the child] was removed from his mother in 2017.  It has been over 40 months since [the child] was removed from her parents, but [Father] failed to take this situation seriously or make any significant improvement in his circumstances until after the filing of the Petition to Terminate his rights.  [Father] seeks to have [the

---

[6] The Juvenile Court's order included a reference to language from a prior statutory version of the persistence of conditions ground, but the court's findings clearly supported the establishment of the ground under the current statutory provisions.

- 11 -

child's] life put on hold while he toys with the struggle of getting his own life together. His expectations are untenable.

The conditions which led to removal of this child continued to persist as of the time of the filing of this Petition to Terminate Parental Rights. [Father] was still using methamphetamine, on top of a prescription for Suboxone and Klonopin. His meth use continued even though he was on probation. He only recently rented a home of his own. He still lacks stable, full time employment and adequate income to support himself and a child. He has no reliable means of transporting the child except to rely on his mother, who has only supervised therapeutic contact with [the child] due to [Father's mother's] own drug problems.

[The child] has been in the care of persons other than her parents for the great majority of her life. She suffers from Post Traumatic Stress Syndrome due to the instability that has characterized her life so far.

It is extremely doubtful that the father's circumstances will be remedied in the near future. It has already been more than three and a half years since [the child] was removed from her parents. Continuation of this parent child relationship greatly diminishes any hope [the child] has for early integration into a safe, stable, and permanent home.

Because the record clearly and convincingly established this ground for termination, we now turn to the final ground relied upon by the Department.

*Failure to Manifest an Ability and Willingness to Personally Assume Custody or Financial Responsibility of the Child*

The last ground for termination relied upon by the trial court is codified at Tennessee Code Annotated section 36-1-113(g)(14). That statute provides that a parent's rights may be terminated when he or she

has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination, which is a relatively new addition to the Tennessee Code, requires the Department to establish two elements by clear and convincing proof. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The Department must first "prove that

[the parent] failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). Second, the Department "must . . . prove that placing the children in [the parent's] 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the chil[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

In our opinion, the first prong of this ground "requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child." *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). To put it another way, consistent with the discussion in the *In re Amynn K.* decision, we do not view a parent's demonstration of "willingness" as fatal to this ground when accompanied by a failure to manifest the requisite "ability." *But see In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) ("The proof at trial negated a required element of the statutory ground. The juvenile court found: 'In this case these parents definitely want to assume legal and physical custody of the children and are willing to assume financial responsibility for the children.'").

In concluding that this ground for termination was established by the proof presented at trial, the Juvenile Court made the following detailed findings:

> In the present case, [Father] voices a willingness to assume legal and physical custody as well as financial responsibility for his child. However, "when considering the parent's *ability*, we focus on 'the parent's lifestyle and circumstances.'" In re Cynthia P., No. E2018-01937-COAR3-PT, 2019 WL [1313237], at p. 8 (Tenn. Ct. App. Mar. 22, 2019). With respect to willingness, "we look for more than mere words" and may consider whether a parent has attempted "to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id.* A lack of effort can undercut a claim of willingness. *See id.*; *see also* In re J'Khari F., 2019 WL 411538, at p.15 (Tenn. Ct. App. January 31, 2019)[.]

> [Father] has only come forth after the filing of the Petition to Terminate his rights to voice that he is now ready and willing to assume legal and physical custody of [the child]. Throughout the course of this case he failed to appear at CFTM[s] (to participate in the creation of any plan to reunify his family) or court hearings concerning permanency planning for [the child]. He did absolutely nothing to indicate his willingness to be a parent to this child from the time of her removal in December, 2015, until he stepped up to claim paternity in June, 2018. He

- 13 -

still had no home of his own and no drivers license as of July, 2018. He began attending parenting classes at Broken Arrow, where he was receiving his prescriptions for suboxone and klonopin, and he completed his first class in June, 2018. Out of the 40 plus months this child has been in the care of someone other than her father, [Father] has been under a no contact order for approximately 24 months due to his repeated abuse of methamphetamine. The other 16 months this father had supervised visitation, but exercised his visitation sporadically, seldom spending more than a few hours a month with his daughter. At the time of the TPR trial in this case, [Father] was still under a no contact order and had not approached the Court to reinstate his visitation. [Father] had recently acquired suitable housing, but still has no drivers license or transportation other than his mother or his employer. More significantly, [Father] has only recently begun to take the meaningful steps to conquer his drug addiction. He had been drug free (not including Suboxone and Klonopin) less than two months at the time of trial. So, in spite of [Father's] vocalization of his desire and willingness to assume the care and custody of his daughter, the hard facts of this case unequivocally demonstrate his lack of ability to care for [the child] now or in the near future.

[Father] further professed a willingness to assume financial responsibility for his child. To his credit, this father did pay his court ordered child support in the token amount of $10 monthly, but that fact alone does not demonstrate an ability to support. To the contrary, at the time of trial, [Father] had, at best, an average monthly income of $300-$400. His currently monthly expenses are $200 month for rent, $150-180 for utilities, and roughly $263.00 monthly for his Suboxone prescription and doctor's visits. He has no health insurance. His phone is a "government" cell phone. If he needs to work more for groceries or "something like that" his employer tries to find him additional odd jobs. These proven facts do not show an ability to financially support a child.

The second prong of T.C.A. §36-1-113(g)(14) requires a court to find that placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. [The child] already suffers from Post Traumatic Stress Syndrome and night terrors resulting from the turmoil she has so far experienced in her young life. Returning her to the persons and environment responsible for her current emotional issues will clearly pose a risk of substantial psychological harm to this child. In addition, [the child] has a medical condition know[n] as "floating femurs" in lay terms that will require a parent who has the ability to understand her medical condition, and who possesses the financial ability to pay for her treatment. When asked at trial

- 14 -

about the problems with [the child's] legs, [Father] replied it was "growing pains." While this Court does not desire to punish any parent for their poverty, the simple truth is that some children have medical problems which necessitate medical treatment that is not free or inexpensive. Unfortunately, [Father] has no health insurance for himself or [the child] except her existing Tenn Care, and he lacks the financial ability to pay for any out of pocket medical cost for [the child]. For this reason, returning [the child] to her father could likely result in substantial physical harm to this child.

The facts of this case unequivocally support a finding by clear and convincing evidence that all elements of T.C.A. §36-1-113(g)(14) have been proven; that this father has failed to manifest an ability to parent [the child]; and, that returning this child to his custody would pose a risk of substantial psychological and/or physical harm to her.

In light of the record and these findings, including the troubling proof that Father had continued drug problems which persisted even after the filing of the termination petition, we discern no error on the part of the Juvenile Court in concluding that this ground for termination was properly established.

*Best Interests*

When at least one ground for termination has been properly established against a parent, we turn our focus to whether termination of the parent's parental rights is in the child's best interests. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013). As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572.

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). The best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). In Tennessee, the General Assembly has codified a list of nine non-exclusive factors that trial courts are to consider when conducting a best interests inquiry in termination of parental rights proceedings. These factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of these factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878.

Here, the Juvenile Court made the following findings pertaining to the child's best interests and relevant statutory factors:

[Father] has not made such an adjustment of his circumstances and conduct that would make i[t] safe and in [the child's] best interest to return to her father's home.

His DCS case managers have made reasonable efforts to assist [Father] in securing funding for assessments and treatment when they could locate him or he was motivated to participate.

[The child] resided in the home of persons other than her parents for 40 out of 47 months since her birth. Out of the 40 plus months since she was removed from her parents, [Father] maintained supervised visitation rights for only 16 months. During those 16 months he visited 3 times in the 4 months preceding the filing of the Petition to Terminate his parental rights and only sporadically prior to that. At his scheduled visit in December, 2018, he was obviously under the influence and tested positive for meth. The foster mother testified that since [the child] came to live with her 19 months ago, [Father] has only initiated contact with her maybe 2 or 3 times, even though she has encouraged contact from him. While the case manager confirmed that [Father's] visits with [the child] generally went well, and he appeared bonded with his daughter, unfortunately, those visits were infrequent and of short duration. Since [the child] is only 4 years old and has not seen her father for months at a time, it is difficult to believe that she experiences any meaningful relationship with [Father]. In contrast, she has been in the same foster home for the past 16 months,[7] where she has been cared for daily by loving, stable individuals to whom she has grown emotionally attached.

[The child] suffers from PTSD as a probable result of the instability and upheavals in her young life. The foster mother confirmed that [the child's] family played emotional games with one another by using the child as a pawn to make the other ones mad. [The child] has also experienced night terrors that her doctors at the sleep center feel is trauma related. Changing caretakers at this point would likely be highly distressful and emotionally damaging to her. Returning her to the persons and environment responsible for her current emotional issues will clearly pose a risk of substantial psychological harm to this child.

---

[7] The "16 months" referenced here appears to be a typographical error. As is evident from its own analysis, the Juvenile Court even earlier referenced the fact that the child came to live with the foster mother 19 months before trial, which was consistent with the foster mother's testimony.

[The child] has a medical condition called "floating femurs" in layman's terms. This condition will require a good care from parent who has the ability to understand her medical issues, and who possesses the financial ability to pay for her treatment. When asked at trial about the problems with [the child's] legs, [Father] replied it was "growing pains." While this Court does not desire to punish any parent for their poverty, the simple truth is that some children have medical problems which necessitate medical treatment that is not free or inexpensive. Unfortunately, [Father] has no health insurance for the child except her existing Tenn Care, and he lacks the financial ability to pay for any out of pocket medical cost for [the child]. For this reason, returning [the child] to her father could likely result in physical harm to this child. In contrast [the child's] foster parents have routinely provided for her medical care and understand the nature of her medical issues.

[The child] is in a loving pre-adoptive home. Her foster mother has made many efforts to encourage [the child's] relationship with her biological family. The foster family has reliable and responsible means to transport [the child] to all of her medical and therapeutic appointments.

[Father] has paid his court ordered token child support of $10 monthly but this is a drop in the bucket toward supporting his child. The foster parents are financially able to care for her and pay for the medical and psychological care she needs.

No doubt [the child's] biological family loves her in their own way, but none of them have demonstrated the responsibility of providing a stable, secure, drug free environment necessary to the well being of a child. [The child] deserves to have permanency now.

For all of these reasons, the Court finds by clear and convincing evidence that termination of her father's parental rights is overwhelmingly in [the child's] best interests.

We agree with the Juvenile Court that the termination of Father's parental rights was in the child's best interests. Father's unfortunate history with illegal drugs has been a serious issue in this case, and the record evidenced that he made less than satisfactory progress. Father failed a number of drug screens and missed others. Although Father eventually began required therapy the month prior to trial, we are in agreement with the Juvenile Court that the child deserves permanency at this point. The child should not be left in limbo. As the Juvenile Court's best interest analysis reflected, there were numerous concerns with returning the child to Father's care, including those related to drugs. The child had been in a pre-adoptive home for over a year and a half by the time

of trial, and her foster mother testified that the child was doing well and that the child did not talk about Father.

In his attempt to argue that termination of his parental rights was not in the child's best interests, Father generally refers in his appellate brief to a prior termination case, *In re Gabriella D.*[8] It is undoubtedly true that termination is not always warranted, as was the case in the *Gabriella* decision. Yet, the inquiry itself is a *fact-intensive* one. *See In re Audrey S.*, 182 S.W.3d at 878. The facts in this case are simply not close to those in *Gabriella*, where, at the time of trial, the children at issue had been residing with the mother without incident for about two years. *In re Gabriella D.*, 531 S.W.3d 662, 672 (Tenn. 2017). Moreover, our Supreme Court noted as follows as it pertained to the mother in that case:

> Mother has achieved a rare accomplishment for parental termination proceedings. She has separated herself from a person who was long an abusive and toxic influence in her life. She has cooperated with DCS and completed all the tasks the permanency plan required of her. She has obtained treatment for a longstanding drug addiction and has remained drug free, as drug screens have demonstrated, for years after completing treatment. She has reestablished relationships with her children and built a strong family support system for herself and the children. The children have thrived in Mother's care and wish to remain with Mother. The expert witnesses and DCS witnesses opined that removing the children from Mother would not be in their best interests.

*Id.* at 686.

Here, Father has not achieved such established success pertaining to his drug problems, and the child has not been in his care since she was approximately six months old. Father's visitation rights have been suspended on two occasions, and there have been prolonged periods where Father has not seen the child. According to Ms. Turner, Father could have resumed visitation after the most recent suspension of his rights if he had "[t]hirty days clean drug screens," but Father never provided proof of that. Moreover, although the foster mother testified that Father was welcome to text anytime and ask about the child, she claimed that he had done so on only a few occasions.

Having reviewed the evidence in the record transmitted to us on appeal, the totality of the circumstances clearly and convincingly weigh in favor of termination of Father's parental rights. As we have noted, the child deserves permanency. Because we

---

[8] Although Father specifically references a dissenting opinion from this Court, we refer herein to the ensuing Supreme Court opinion, which, like the cited dissent from this Court, concluded that termination was not warranted.

agree with the Juvenile Court that Father's parental rights should be terminated, the order of termination is hereby affirmed.

## CONCLUSION

For the foregoing reasons, the termination of Father's parental rights is affirmed.


_____
ARNOLD B. GOLDIN, JUDGE